**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DENISE MYRICK,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:05-CV-1213-B (BH)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and an *Order of Reference* from the District Court dated August 18, 2005, the subject cause has been referred to the undersigned United States Magistrate Judge for report and recommendation. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed October 26, 2005; *Commissioner's Motion for Summary Judgment*, filed December 28, 2005; and *Plaintiff's Reply to Brief of Defendant*, filed January 17, 2006. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned recommends that *Plaintiff's Motion for Summary Judgment* be **DENIED**, *Commissioner's Motion for Summary Judgment* be **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

# I.    BACKGROUND[1]

## A.    Procedural History

Denise Myrick ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title II and Title XVI of the Social Security Act.  Plaintiff filed an application for disability benefits on December 12, 2002, claiming a disability onset date of May 13, 2000.  (Tr. at 70).  Plaintiff claimed she was disabled due to carpal tunnel syndrome in both wrists; nerve damage in both hands; a pinched nerve in her back; pain in both feet, shoulders, and elbows; and knee pain.  (Tr. at 73).  Plaintiff's application was denied initially and upon reconsideration.  (Tr. at 10).  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  *Id*.  Plaintiff appeared and testified at a hearing held on September 15, 2004.  *Id*.  On January 28, 2005, the ALJ issued her decision finding Plaintiff not disabled.  (Tr. at 19).  The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request did not provide a basis for changing the ALJ's decision.  (Tr. at 3).  Consequently, the ALJ's decision became the final decision of the Commissioner.  *Id*.  Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on June 15, 2005.

## B.    Factual History

### 1.  Age, Education, and Work Experience

Plaintiff was born on May 9, 1954.  (Tr. at 70).  She graduated from high school in 1972 and received special job training in cosmetology.  (Tr. at 77).  Her past relevant work experience included employment as a hair dresser.  (Tr. 74-75, 77).

---

[1]The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

## 2. Medical Evidence

On April 17, 1995, Dr. Frank Morrison, M.D., evaluated Plaintiff on a referral from Dr. John McConnell, M.D. for "longstanding left upper extremity pain and numbness." (Tr. at 110). Dr. Morrison found a weakness in Plaintiff's left side and also noted her complaints of numbness and tingling of the left index and ring fingers, loss of grip strength, and spasm-like pain of the wrist and hand. *Id.* Dr. Morrison conducted an electromyographic ("EMG") examination of Plaintiff's upper extremities; the result of the EMG was abnormal. (Tr. at 114). Dr. Morrison noted that the abnormal EMG findings were consistent with (1) carpal tunnel syndrome, on the left, chronic and mild to moderately severe; and (2) posterior interosseous syndrome on the left, chronic and moderate to severe in nature. (Tr. at 114-15). Dr. Morrison did not find any compelling evidence of cervical radiculopathy, brachial plexus lesion, or nerve injury or entrapment. (Tr. at 115).

The first medical record in the evidence from Dr. McConnell is dated June 21, 2000.[2] (Tr. at 204). Dr. McConnell wrote that Plaintiff "continues to have pain with attempts to grasp and use the upper extremity. At this point, she feels she cannot return to her usual job as a hairdresser. I tend to agree with her." *Id.* Dr. McConnell diagnosed her with (1) right hand and wrist pain; (2) right wrist carpal tunnel syndrome; (3) right elbow pain and paresthesias; (4) right elbow cubital tunnel syndrome; (5) right elbow medial epicondylitis; (6) right shoulder impingement syndrome; (7) left wrist and hand pain; (8) left wrist and hand carpal tunnel syndrome; (9) left elbow pain; (10) left elbow cubital tunnel syndrome; (11) left shoulder pain; and (12) left shoulder impingement syndrome. (Tr. at 205).

On July 14, 2000, upon referral from Dr. McConnell, Plaintiff submitted to another EMG

---

[2]Plaintiff claims to have undergone surgery for tennis elbow and carpal tunnel by Dr. McConnell sometime in 1995. (Tr. at 116, 216). However, there are no medical records in the transcript to document this alleged surgery.

by Dr. Morrison. (Tr. at 107). His examination disclosed (1) right carpal tunnel syndrome, chronic and moderate to severe; (2) right radial tunnel syndrome, chronic and moderately severe; (3) right cubital tunnel syndrome, chronic and moderate to severe; and (4) right C7 radiculopathy, chronic and moderately severe. (Tr. 107-108). All four of these ailments represented new and significant findings since Plaintiff's last EMG on April 17, 1995. *Id*. However, based on his examination, Dr. Morrison did not see any compelling evidence of brachial plexus lesion, or peripheral nerve injury or entrapment syndrome. (Tr. at 108).

Plaintiff also visited Dr. McConnell on July 14, 2000, complaining of pain in the right hand, wrist, elbow, and shoulders, in addition to simple stiffness and pain in the left side of her body. (Tr. at 200). Dr. McConnell stated that "it has become obvious that this patient simply does not tolerate repetitive use of the hands, repetitive grasping, repetitive wrist flexion, repetitive opening and closing, which is required to do her profession as a hair dresser." *Id*. Dr. McConnell also opined that Plaintiff was "essentially totally disabled from her employment as a hair dresser." *Id*. Dr. McConnell stated that Plaintiff's "disability at present has to do with peripheral nerve entrapment at the carpal tunnel, radial tunnel, and cubital tunnel," although he also wanted further evaluation for C7 radiculopathy, fibromyalgia, and rheumatoid arthritis. (Tr. at 201-02).

Plaintiff felt no abatement in her right and left upper extremity pain during a follow-up examination with Dr. McConnell on October 18, 2000. (Tr. at 196). Examination revealed a positive Tinel's sign over the carpal and cubital tunnels, positive Phalen's test, positive Speed's test, and positive percussion pain over the radial tunnel. *Id*.

During a November 17, 2000, visit with Dr. McConnell, Plaintiff reported morning stiffness of multiple joints, and in particular, the small joints in the hands. (Tr. at 194). She described

intermittent swelling and tenderness over the muscle in the elbow, and pain and tenderness in the right shoulder. *Id.* Examination also revealed a positive Tinel's sign over the cubital and carpal tunnels on the right upper extremity. *Id.* At that point, Dr. McConnell suggested that Plaintiff visit a rheumatologist for continuing treatment because he "did not have much to offer from the stand point of surgical treatment." *Id.* He also expressed concern for the progressive symptoms in Plaintiff's knees. *Id.*

On May 16, 2001, Plaintiff returned to Dr. McConnell with pain in both the right and left upper extremities. (Tr. at 189). She continued to suffer from pain at the base of the thumb on the right side with positive Tinel's sign over the carpal and cubital tunnels on the right and positive impingement and Speed's test in the right shoulder. *Id.* The left shoulder also caused pain and showed positive impingement sign and tenderness over the biceps long head. *Id.* The diagnosis included tenderness over the medial joint line, localized pain with subpatellar crepitation, and moderate effusion of the knees. *Id.* On June 20, 2001, plaintiff complained to Dr. McConnell of sharp and occasionally throbbing pain in the left knee. (Tr. at 168). An MRI study conducted a week earlier by Dr. Sandro Parish, M.D., offered no evidence of a meniscal tear did show a small effusion. (Tr. at 168-69). Dr. McConnell recommended that Plaintiff continue taking Vioxx, soaking in a hot tub, and elevating her leg, all of which provided some relief. (Tr. at 167, 169).

Plaintiff reported mild improvement in her left knee and left hip pain during a July 25, 2001, visit to Dr. McConnell. (Tr. at 183). Plaintiff explained that she exercised regularly in her home swimming pool; she reported full range of motion in her left knee and hip, but complained of left knee medial and lateral joint pain as well as left lateral thigh pain. *Id.* Associated symptoms included popping and giving way, and she described the pain as significant enough to disturb her

sleep. *Id.*

On October 24, 2001, Plaintiff visited Dr. McConnell with reports that her left knee "gave out," resulting in swelling and pain. (Tr. at 181). An examination revealed quadriceps atrophy and crepitus upon palpitation; however, Plaintiff retained a full range of motion at her left knee with no obvious enema. (Tr. at 182). Plaintiff received three Synvisc injections into her knee in 2001 on November 28, December 5, and December 12. (Tr. 179, 177, 175). Plaintiff also reported a right wrist injury; however, an examination revealed no obvious enema, no tenderness, and 5/5-grip strength. (Tr. 182).

On January 23, 2002, Plaintiff reported sharp pains and soreness around the kneecap, intermittent aches and soreness in the right elbow, and sharp, cutting pain in the left shoulder radiating into the neck.[3] (Tr. 153). Examination revealed tenderness of the right wrist over carpal tunnel with mildly positive Tinel's sign, slight tenderness over the right wrist dorsum, left shoulder tenderness, mild effusion of the left knee, and subpatellar crepitation. (Tr. 154). Dr. McConnell reiterated that it would be worthwhile for Plaintiff to seek a consultation from a rheumatologist. (Tr. at 153). Dr. McConnell noted that he believed that it would be difficult for Plaintiff to work as a hairdresser, and that according to Plaintiff, she did not have significant skill sets outside those involved in her previous profession. *Id.*

On February 27, 2002, Dr. McConnell examined Plaintiff and noted that she continued to experience mechanical pain symptoms and catching left knee. (Tr. at 150). Plaintiff also experienced problems that prevented her from standing and walking for prolonged periods and from

---

[3]The medical records labeled Tr. 153-54 are identical to the records labeled Tr. 173-74, except the latter record is signed and dated February 23, 2001. Because Dr. McConnell's description of Plaintiff's "history of present illness" in the records included a mention of the Synvisc injections Plaintiff received in November and December 2001, the February 23, 2001 date appears to be an error.

repetitive use of the hands and shoulders.  *Id.*

A follow-up examination on May 29, 2002, revealed that Plaintiff showed tenderness over the right elbow, wrist, and thumb base, in addition to tenderness and pain in the right and left shoulders.  (Tr. at 148).  Plaintiff also suffered from left knee popping, and a positive Apley's test suggested an internal derangement such as a torn meniscus.  (Tr. 149).  It was his opinion that Plaintiff was "still disabled from doing the usual tasks of a working person and/or tasks for which she is accustomed based on training, education, and experience."  (Tr. at 146).  Dr. McConnell wrote that "[b]ecause of [Plaintiff's] multiple joint and muscular tendon complaints, I think she should see a rheumatologist.  I am going to ask my office staff to schedule her to see Dr. Cheatum [a rheumatologist at Presbyterian Hospital in Dallas].  She needs to be evaluated for possible rheumatologic disorders including fibromyalgia."  (Tr. at 149).  Dr. McConnell noted that Plaintiff told him that she was denied disability benefits and that he would be happy to assist with a functional capacity evaluation; he mentioned that Dr. Cheatum could conduct the functional capacity evaluation.  (Tr. at 147).

Plaintiff returned to Dr. McConnell complaining of symptoms involving the left and right upper and lower extremities on November 13, 2002.  (Tr. at 140).  She reported right hand and wrist pain and paresthesias at the elbows.  *Id.*  Dr. McConnell's examination revealed full range of motion in the left shoulder with pain on extremes.  (Tr. at 141).  Tenderness also existed over the subacromial region with some slight crepitation noted with palpitation.  *Id.*  A lower extremity exam showed slight tenderness over the whole plantar surface of the feet bilaterally.  *Id.*  Dr. McConnell noted that Plaintiff had not yet visited Dr. Cheatum, the recommended rheumatologist, and indicated that he would again assist her in getting an appointment.  *Id.*

On February 12, 2003, Plaintiff reported to Dr. McConnell polyarthralgic-type symptoms, which include bilateral wrist, elbow, and shoulder pain. (Tr. at 137). Subsequent examination of the bilateral shoulders and elbow revealed full range of motion with pain on the extremes. (Tr. at 138). A wrist exam showed positive Phalen's and positive Tinel's at the right carpal tunnel only. *Id.* Despite Dr. McConnell's referral of Plaintiff to Dr. Cheatum, she never visited him or any other rheumatologist. *Id.* Dr. McConnell noted that he would again attempt to schedule an appointment with Dr. Cheatum, but that it was Plaintiff's responsibility to follow up. (Tr. at 138).

Dr. Mike Lee, M.D., a consultative examiner, evaluated Plaintiff on February 28, 2003, at the request of the Texas Rehabilitation Commission. (Tr. at 116-20). Plaintiff complained to Dr. Lee of carpal tunnel syndrome, back, feet, shoulder, elbow, and knee problems. (Tr. at 116). Examination revealed no tenderness or muscular atrophy in the back and a negative straight leg test, 5/5 bilateral motor strength, and negative Homan's sign in the extremities. (Tr. 118-19). Although tenderness on palpitation of the left knee and crepitus existed, Plaintiff retained full range of motion in the bilateral knees with no sign of effusion. (Tr. at 119). Plaintiff did not have crepitus in her shoulders or effusion in her elbows. *Id.* Dr. Lee's diagnostic impression was that of carpal tunnel syndrome and osteoarthritis. *Id.* Dr. Lee observed that Plaintiff drove and walked to the clinic by herself without any aids and noted that Plaintiff sat and stood through the interview and examination with no instability of the back and no circulatory defects. (Tr. at 118-19). Furthermore, Plaintiff demonstrated no loss of motion in the upper extremities and successfully buttoned her clothes and picked up pens from the floor; however, Plaintiff possessed a poor prognosis for weight bearing. (Tr. at 120). Lastly, Dr. Lee noted Plaintiff's weak grip strength but no problem using her hands to feel and reach. *Id.*

On March 17, 2003, Dr. Terry Collier, M.D., a non-examining consultative physician reviewed Plaintiff's medical record. (Tr. at 123-31). He noted that Plaintiff had no significant motor loss and that she had no problems using her hands and feet to reach. (Tr. at 124-25). He further noted that Plaintiff's alleged limitations were not fully supported by the medical and other evidence. (Tr. at 128).

The record indicates one final visit to Dr. McConnell on May 21, 2003, where Plaintiff reported an intermittent dull ache originating in her back. (Tr. at 133). She complained of local tenderness, loss of motion, and hypersensitivity in the area. *Id.* Examination revealed that Plaintiff ably engaged in glenohumeral motion greater than 90 degrees in forward flexion at the right shoulder but showed positive Codman's sign in abduction. (Tr. at 134). Furthermore, Plaintiff continued to miss scheduled appointments to the rheumatologist. (Tr. at 133). Dr. McConnell noted that Plaintiff "fears going to a rheumatologist because a rheumatological diagnosis may interfere with her ability to continue receiving disability payments."[4] *Id.* Dr. McConnell once again advised Plaintiff to consult with a rheumatologist and stated that because her complaints fell outside his area of orthopedic practice, he would not schedule a follow-up appointment. (Tr. at 135).

### 3. Hearing Testimony

At the hearing on September 15, 2004, the ALJ heard testimony from Plaintiff and a Vocational Expert ("VE"). (Tr. 206-31). Plaintiff was represented by an attorney at the hearing. (Tr. 206).

### a. Plaintiff's Testimony

Plaintiff testified that she was 50 years old, married, had completed high school, and received

---

[4]Plaintiff testified at the administrative hearing that she has been receiving disability payments since 2000 from a five-year policy that she holds from a private insurance carrier. (Tr. at 222).

a cosmetology license. (Tr. at 209). Plaintiff's past work experience involved operating a beauty salon for 26 years where she took appointments, answered the phone, cut and styled hair, and kept the books. (Tr. at 211-12). Plaintiff testified that she worked full time until 1995, when she switched to part-time work following an operation in her left arm. (Tr. at 212). Plaintiff explained that she closed the shop in 2000 when she "was not physically able to do hair any longer." *Id.* She was not working at the time of the hearing. *Id.*

Regarding her physical condition, Plaintiff testified that at the time she closed her salon, she suffered from cramping, numbness, sharp pains, and swelling in the arms and hands. (Tr. at 216). Plaintiff stated that on a scale of zero to 10, with 10 being the greatest pain a person could experience and remain alive and zero being no pain, her arm and hand pains were between seven and eight. *Id.* In order to alleviate the pain, Plaintiff explained that she soaked in a hot tub, applied heating pads, and lay down at periodic intervals. (Tr. at 217-18). Plaintiff testified that she has difficulty lifting and gripping a quart of milk. (*See* Tr. at 218). Plaintiff also testified that her prescription medication for the pain sometimes caused nausea and lightheadedness. (Tr. at 219). Plaintiff stated that she experienced sharp pains in her feet that "feel like a knife is cutting into them when I walk," in addition to swelling. (Tr. at 219-20). She stated that such pains occurred when she stood for more than 15 or 20 minutes. (Tr. at 220). Furthermore, Plaintiff testified that she had "terrible problems" with her knees that inhibited her ability to walk, step up, and get out of a chair. *Id.* She explained that she could not sit more than 30 or 45 minutes without experiencing discomfort. (Tr. at 221).

With respect to her daily activities, Plaintiff testified that she drove approximately three times a week and did not use public transportation. (Tr. at 212-13). Since the onset of her disability

on May 13, 2000, she had traveled from her home in Commerce to the Fort Worth area. (Tr. at 214). In addition, Plaintiff took family vacations by plane to Nevada and Kansas. *Id.* Plaintiff also explained her daily routine, in which she arose at approximately 7:00 a.m., took a hot bath, had her morning coffee, and performed housework for approximately 30 minutes. (Tr. at 218).

### b. VE Testimony

The VE testified that Plaintiff's previous work as a hair stylist was classified the Dictionary of Occupational Titles ("DOT") as occupation 332.271-018, a light and skilled job with a specific vocational preparation ("SVP") of six. (Tr. at 223). The work-history information, however, indicated a heavy exertional level requiring lifting 100 pounds. (Tr. at 223-24). The ALJ asked Plaintiff to describe situations that required her to lift at least 100 pounds. (Tr. at 224). Plaintiff responded that she helped elderly customers from a sitting to standing position; however, she did not lift or carry these people. *Id.* The VE testified that Plaintiff possessed no transferable skills. (Tr. at 225).

The ALJ then posed a series of hypothetical questions to the VE based on an individual with Plaintiff's age, education, and work experience. *Id.* The first hypothetical involved a light exertional limit with no non-exertional limits. *Id.* The ALJ asked the VE whether that hypothetical person could do the past relevant work of the Plaintiff, and the VE responded, "yes." (Tr. at 225-26). The second hypothetical involved a light exertional limit with the following non-exertional limitations: frequent handle and finger with left and right upper extremities, and constant reach and feel with both the left and right upper extremities. *Id.* The ALJ posed the same question, and the VE responded in the affirmative. *Id.*

The third hypothetical imposed a light exertional limit with the following non-exertional

limitations: occasional handle and finger with the left and upper right extremities, and constant reach and feel with the left and right upper extremities. *Id*. Here, the VE answered that such a person could not perform Plaintiff's past relevant work as a hair stylist. *Id*. The ALJ then asked whether any jobs could be performed under the third hypothetical. *Id*. The VE responded that the hypothetical person could perform the light, unskilled, SVP two position of a counter clerk (DOT number 249.366-010). *Id*. According to the VE, approximately 55,000 of these job types existed in the national economy and approximately 4,400 jobs located in Texas. (Tr. at 226-27). The VE also testified that such a person could work as a bakery worker (DOT number 524.687-022, light, SVP 2 with 350,000 jobs in the national economy and 20,000 in Texas) or as a furniture rental consultant (DOT number 295.357-018, light, unskilled, SVP 2 with 50,000 jobs in the national economy and 4,000 in Texas).

The fourth hypothetical imposed the same non-exertional limitations as the second hypothetical with an exertional limitation of sedentary. (Tr. at 227). The VE answered that such a person could not perform Plaintiff's past relevant work as a hair stylist. *Id*. The VE then explained that the hypothetical person, under the fourth hypothetical's framework, could work as a document preparer, charge account clerk, or telephone quotation clerk, all of which were light, unskilled, sedentary, SVP 2 positions. Taken as an aggregate, approximately 190,000 of these jobs exist in the national economy with approximately 12,600 jobs located in Texas. (Tr. at 227-28).

The fifth hypothetical also imposed a sedentary exertional limit with identical non-exertional limitations as hypothetical three. (Tr. at 228). Again, the VE explained that the hypothetical person could not perform Plaintiff's past relevant work as a hair stylist but could work as a call-out operator. *Id*. Approximately 11,000 call-out operator positions existed in the national economy with

approximately 800 located in Texas. *Id*. The last hypothetical imposed exertional and non-exertional limitations that created a RFC that was less than sedentary. (Tr. at 229). The VE answered that the hypothetical person could not perform Plaintiff's past relevant work and that no competitive jobs existed under the last hypothetical. *Id.*

When questioned by Plaintiff's attorney as to whether the inability to grip or lift anything weighing more than one pound would impact the hypothetical person's capacity to work, the VE testified that such a restriction could impact the hypothetical person's ability to perform the jobs cited by the VE. When asked whether missing 45 minutes two times a day to take baths would impact the ability to perform work, the VE answered such unscheduled breaks would preclude the ability to sustain work. (Tr. at 230).

## C.     ALJ's Findings

The ALJ issued her decision denying benefits on January 28, 2005. (Tr. at 10-19). In her findings, the ALJ stated that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability on May 13, 2000. (Tr. at 11; Tr. at 17, ). The ALJ found that Plaintiff had severe impairments consisting of carpal tunnel syndrome and degenerative changes of the left knee. (Tr. at 12; Tr. at 17, ¶3). However, the ALJ found that these impairments did not meet or medically equal any of the listed impairments. (Tr. at 12; Tr. at 17, ¶4). The ALJ noted that Plaintiff repeatedly declined all definitive treatment modalities since she requested disability status in relation to her profession as a hairdresser. (Tr. at 12). The ALJ also noted that Plaintiff had not sought treatment from a rheumatologist, despite repeated referrals from her treating physician, out of concern that a different diagnosis might prevent her from receiving disability insurance payments from a private carrier. (Tr. at 12-13). The ALJ found Plaintiff's allegations regarding her

limitations were not totally credible because they were inconsistent with the medical evidence as well as her own activities of daily living. (Tr. at 14; Tr. at 18, ¶5).

The ALJ concluded that Plaintiff retained the residual functioning capacity ("RFC") to lift and carry 20 pounds occasionally and 10 pounds frequently; sit for six of eight hours; stand and walk for six of eight hours; and handle and finger with both upper extremities occasionally. (Tr. at 18, ¶6 ). The ALJ found that Plaintiff was unable to perform her past relevant work as a hairdresser. (Tr. at 18, ¶7). The ALJ stated that the VE's testimony indicated that although Plaintiff had no transferrable skills from any past relevant work, she retained the RFC to perform a significant range of light work. (Tr. at 18, ¶¶10, 11). Examples of such jobs that Plaintiff was capable of performing were counter clerk, bakery worker, and furniture rental consultant. (Tr. at 18, ¶12). In the aggregate, these three light, unskilled jobs with an SVP of 2 had approximately 450,000 positions in the national economy and approximately 28,400 positions in Texas. *Id*. Accordingly, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act at any time through the date his decision. (Tr. at 18, ¶13).

## II.    ANALYSIS

### A.    Legal Standards

#### 1.    *Standard of Review*

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-344 (5th Cir. 1988).

### 2.     *Disability Determination*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.     An individual who does not have a "severe impairment" will not be found to be disabled.

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.     If an individual is capable of performing the work he has done in the past, a finding

of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    Issues for Review**

Plaintiff presents the following issues for review:

(1)    Did the Defendant Commissioner properly evaluate Plaintiff's residual functional capacity?

(2)    Did the Defendant Commissioner give due credit to the opinion expressed by Plaintiff's treating physician?

(3)    Did the Defendant Commissioner properly evaluate Plaintiff's credibility?

(Pl. Br. at 1). Plaintiff contends that a lack of substantial evidence supports each of these issues.

## C.    Issue One: Residual Functional Capacity

Plaintiff contends that the ALJ's assessment of Plaintiff's RFC is unsupported by substantial evidence. (Pl. Br. at 8). In particular, Plaintiff argues that the ALJ failed to consider her limitations due to osteoarthritis of the knees and limited use of the extremities when the ALJ posed the hypothetical questions to the VE. (*Id*. at 12).

 "The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). When assessing a claimant's physical and mental abilities, the ALJ first assesses the nature and extent of the claimant's physical and mental limitations and then determines the RFC. 20 C.F.R. § 404.1545(b) and (c). "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id*. The RFC is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1379, 1386-87 (5th Cir. 1988).

In the instant case, the ALJ based her assessment of Plaintiff's RFC on evidence from treating and examining physicians as well as on Plaintiff's own testimony. (Tr. at 12-14). The objective medical evidence from Dr. McConnell, Plaintiff's treating physician, between July 2000

and May 2003 revealed several inconsistencies with Plaintiff's subjective complaints of pain in her knees and limited use of her extremities. For example, on May 16, 2001, Dr. McConnell examined Plaintiff for her specific complaint of knee pain. (Tr. at 189). Although Dr. McConnell noted tenderness over the medial joint line and mild effusion of both knees in his examination, a MRI revealed no meniscal tear and only small effusion. (Tr. at 188-89). Plaintiff also reported mild improvement in her left knee pain with full range of motion in a follow up examination on July 25, 2001. (Tr. at 181). When Plaintiff returned on October 24, 2001, with subjective complaints of left knee pain, right wrist pain, and reduced grip strength, Dr. McConnell noted that Plaintiff possessed 5/5-grip strength and showed no signs of wrist tenderness. (Tr. at 182). In addition, Dr. McConnell mentioned in his report that Plaintiff never fell despite complaining that her left knee "gave out." (Tr. at 181). During two separate visits to Dr. McConnell in November 2002 and February 2003, Dr. McConnell's examination revealed that Plaintiff enjoyed full range of motion in the left shoulder (with some crepitation), bilateral shoulders, and elbow. (Tr. at 137-38, 140-41). Although Dr. McConnell diagnosed Plaintiff with a number of ailments that impacted her ability to use her upper extremities, he never gave a detailed assessment of how these limitations impacted her daily work activities or capacity for work, apart from that she was unable to continue in her profession as a hair dresser. *See e.g.* Tr. at 141, 153, 200-02. Moreover, Dr. McConnell recommended that Plaintiff see a rheumatologist on several occasions for specialized treatment of her ailments, but Plaintiff repeatedly failed to follow through with the appointments out of fear that a different diagnosis would cause her to lose her private disability insurance. (Tr. at 135, 138, 147, 153).

The ALJ also considered medical evidence from a consultative examiner, Dr. Lee, in her assessment of Plaintiff's RFC. Dr. Lee noted that Plaintiff drove and walked to the clinic by herself

without any assistive devices and could sit and stand throughout the duration of the examination. (Tr. at 118). Although the examination revealed a poor prognosis for weight bearing, examination showed a negative straight leg test, 5/5 bilateral motor strength, negative Homan's sign in the extremities, full range of motion in both knees, and no loss of motion in the upper extremities. (Tr. at 118-120). Furthermore, Plaintiff demonstrated no loss of motion in the upper extremities and successfully buttoned her clothes and picked up pens from the floor. (Tr. at 118-19). Dr. Lee concluded, "[t]he alleged limitations caused by the [Plaintiff's] symptoms are not fully supported by the medical and other evidence." (Tr. at 128).

In addition to evidence from medical doctors, the ALJ also considered Plaintiff's own testimony at the administrative hearing regarding her functional limitations. Plaintiff testified that she had "terrible problems" with her knees that inhibited her walking, getting out of a chair, and stepping up. (Tr. at 220). Despite these alleged impairments, Plaintiff testified that she was able to perform housework each day and take family vacations to Nevada and Kansas. (Tr. at 218, 220). The evidence supports the ALJ's finding of Plaintiff's RFC.

Plaintiff contends that the ALJ was required to explain the limitations resulting from Plaintiff's carpal tunnel syndrome and degenerative changes to the left knee, the impairments the ALJ determined to be "severe"at Step 2. (Pl. Br. at 9; *see* Tr. at 17, ¶3). However, this contention misstates the applicable regulations since the ALJ need only *consider* the limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p, 1996 WL 374184, at *1. The symptoms must reasonably be accepted by the ALJ as consistent with the objective medical evidence and statements by the claimant. 20 C.F.R. § 404.1529(a). The determination of a claimant's RFC does not require an explicit finding of how

each impairment impacts the ability to perform work; rather, RFC is a combined medical assessment of impairments and their impact on a claimant's ability to work. *See Hollis*, 837 F.2d at 1386-87.

The ALJ's assessment of Plaintiff's RFC considered Plaintiff's severe, medically determinable limitations of carpal tunnel and degenerative left knee problems. As discussed in Part II.C.1, *supra*, Plaintiff's alleged limitations from her severe impairments of carpal tunnel and degenerative left knee were not consistent with the objective medical evidence or her own testimony. Nevertheless, the ALJ accounted for Plaintiff's limitations in the hypothetical questions she posed to the VE. (*See* Tr. at 225-29). Even assuming, *arguendo*, that the ALJ improperly considered Plaintiff's left knee problems when she determined Plaintiff's capacity for standing and walking, the VE answered a hypothetical with a sedentary exertional limitation. (Tr. at 227). The VE testified that Plaintiff could work as a document preparer, charge account clerk, or as a telephone quotation clerk. *Id*. The ALJ therefore properly assessed Plaintiff's RFC and her capacity for gainful employment.

Based on the medical evidence from Plaintiff's treating and examining physicians as well as her own testimony, the Court finds that substantial evidence supports the ALJ's finding of Plaintiff's RFC. *Leggett*, 67 F.3d at 564.

## D.    Issue 2: Proper Weight for the Opinion of a Treating Physician

Plaintiff contends that the ALJ failed to accord proper weight to Dr. McConnell's opinion that Plaintiff was disabled because he frequently noted that she could not perform her past work as a hair dresser or any other work duties. (Pl. Br. at 12-14; Pl. Reply at 3-4).

Plaintiff vigorously asserts that the ALJ did not accord proper weight to Dr. McConnell's opinion that Plaintiff was disabled. However, Plaintiff's argument does not recognize the distinction

between the weight accorded to a *medical* opinion given by a treating physician and the *legal* determination of disability made by an ALJ. With regards to a medical opinion from a treating source, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Treating physicians can also provide an opinion on disability, and the Commissioner is required to review all medical findings that support such a statement on disability. 20 C.F.R. 404.1527(e). However, the mere statement of "disabled" or "unable to work" by a treating physician does not support a finding of disability. *Id*. This is because "[e]ven though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990)). In other words, it is the ALJ who makes the legal determination of whether a claimant is disabled.

In the instant case, Dr. McConnell opined that Plaintiff was "essentially totally disabled from her employment as a hair dresser" and that she was "still disabled from doing the usual tasks of a working person and/or tasks for which she is accustomed based on training, education, and experience." (Tr. at 146, 200). These are clearly legal, rather than medical, opinions on an issue reserved to the Commissioner. *See* 20 C.F.R. 404.1527(e). Nevertheless, the ALJ addressed Dr. McConnell's opinions as to Plaintiff's disability in her written decision. (Tr. at 13). The ALJ found that Dr. McConnell's assessment regarding Plaintiff's ability to return to her past relevant work as a hair dresser was well-supported. *Id*. Indeed, the ALJ concurred with Dr. McConnell and gave

substantial weight to his opinion by finding at Step 4 that Plaintiff could not return to her previous work as a hair dresser.  (Tr. at 18, ¶7).

The ALJ did not accord such weight to Dr. McConnell's other opinion that Plaintiff could not perform the tasks of a normal working person because this proposal was not supported by objective medical findings substantiating such a limitation.  (Tr. at 13).  While Plaintiff experienced some functional limitations, nothing in Dr. McConnell's medical records supports the blanket assertion that Plaintiff is precluded from all types of work.  Moreover, the objective medical evidence from Dr. Lee, Plaintiff's consultative physician, provided evidence that Plaintiff's limitations were not as severe as alleged.  Specifically, Dr. Lee found that Plaintiff possessed full range of motion in the shoulders and knees; drove herself to the examination; sat and stood for the duration of the examination with no difficulties, and buttoned her clothes and picked up a pen from the floor with no problems.  (Tr. at 119-20).  Dr. Lee specifically noted that Plaintiff had no problem with using her hands to feel and reach.  (Tr. at 120).  Dr. Lee's conclusion, based on first-hand physical examinations and x-rays, clearly contradicts Dr. McConnell's assessment that Plaintiff could not perform "the usual tasks of a working person."  (*See* Tr. at 200).  As such, good cause existed for the ALJ to reject Dr. McConnell's opinion on this point.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Martinez*, 64 F.3d at 176.  Additionally, the testimony of the VE, which incorporated Plaintiff's medically determinable impairments and limitations, provided evidence of a significant number of jobs in the regional and national economy that Plaintiff could perform.  (Tr. at 225-230).  Like Dr. Lee's findings, the testimony of the VE refuted Dr. McConnell's opinion that Plaintiff could not perform any other work.

Because the legal determination of disability rests with the Commissioner and because

objective medical evidence did not support Dr. McConnell's opinion that Plaintiff was totally disabled, the Court finds that substantial evidence supports the ALJ's decision to discount Dr. McConnell's opinion regarding Plaintiff's capacity to perform other work. *Leggett*, 67 F.3d at 564.

**E.      Issue 3: Proper Evaluation of Plaintiff's Credibility**

Plaintiff's final issue for review is that the ALJ failed to evaluate properly Plaintiff's credibility regarding her alleged limitations. (Pl. Br. at 15-16).

"Credibility determinations are generally the province of the ALJ and are entitled to deference." *Lam v. Apfel*, 2000 WL 354393, *4 (N.D. Tex. Apr. 5, 2000); *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir.1991). Nevertheless, the ALJ's "determination or decision [regarding credibility] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7p, 1996 WL 374186, *4 (S.S.A. July 2, 1996). To shed light on an individual's credibility, Social Security regulations provide a non-exclusive list of the following seven relevant factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms;(3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back...); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." (*Id*. at *3)

The Fifth Circuit "recognized that an absence of objective factors indicating the existence of severe pain - such as limitations in the range of motion, muscular atrophy, weight loss, or impairment of general nutrition - can itself justify the ALJ's conclusion." *Hollis v. Bowen*, 827 F.2d 1378, 1384 (5th Cir. 1998). With regards to pain, it is a disabling condition under the Social Security Act only where the pain is "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983)). Although the ALJ must consider subjective evidence of pain, it is within the ALJ's discretion to determine its debilitating nature, and such determinations are entitled to considerable deference. *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987). Therefore, the ALJ "may properly challenge the credibility of a claimant who asserts he is disabled by pain." *Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981).

In this case, the ALJ provided specific reasons for her credibility determination based on the objective medical evidence, Plaintiff's own statements about her symptoms, the statements of both the treating and consultative physicians, and the factors listed in 20 C.F.R. § 404.1529(c)(3)(i)-(vii). (*See* Tr. at 15, 17). At issue then, is whether there is substantial evidence to support the bases upon which the ALJ relied in making the credibility determination. The record reflects that despite her allegations of functional limitations and disabling pain, Plaintiff had not sought regular medical care by a treating physician since May of 2003. (*See* Tr. at 133-35). None of the examinations by any of Plaintiff's treating or examining physicians recorded a diagnosis that supported Plaintiff's alleged limitations, including those of disabling pain. Plaintiff also repeatedly refused to see a rheumatologist, a specialist who might have been able to provide more effective treatment, even though her treating physician recommended that she do so on several occasions. *See e.g.* Tr. at 135,

-24-

147, 153. Dr. McConnell noted that Plaintiff's reluctance was based on a fear that a "different" diagnosis would lead to the cessation of private disability payments. Tr. at 135. Although there is no evidence that treatment by a rheumatologist would have provided definitive treatment, Plaintiff's refusal to explore this reasonable possibility of relief provides substantial evidence that her pain is not disabling. *See Harrell*, 862 F.2d at 480.

The record also reflects an inconsistency between Plaintiff's daily activities and one who alleges to be in constant, disabling pain. For example, the record showed that Plaintiff rises early and takes care of her own personal hygiene and grooming needs and does household chores each morning. (Tr. at 218). She has traveled to such destinations as Nevada and Kansas. (Tr. at 214). She also soaks in a hot tub daily for heat therapy and pain relief and uses her swimming pool to exercise. (Tr. at 183, 216). Inconsistencies between a claimant's testimony about her limitations and daily activities are "quite relevant" in evaluating credibility. *Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir. 1990).

Based on the medical evidence in the record and Plaintiff's own testimony at the administrative hearing, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff's allegations regarding her limitations are not wholly credible. *Leggett*, 67 F.3d at 564.

## III.   RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that *Plaintiff's Motion for Summary Judgment* be **DENIED**, *Commissioner's Motion for Summary Judgment* be **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

**SO RECOMMENDED** on this 31st day of August, 2007.

*Irma Carrillo Ramirez*
*IRMA CARRILLO RAMIREZ*
*UNITED STATES MAGISTRATE JUDGE*

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

*Irma Carrillo Ramirez*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE